Hoon K. JEUNG, Plaintiff,

v.

Denise MCKROW, Roger Marshall K. Michael Weaver, Daniel Hittler, Garth M. Murray, and Hills & Dales General Hospital, Inc., Defendants.

No. 01–10204–BC.

United States District Court, E.D. Michigan, Northern Division.

April 9, 2003.

---

558

Patrick McLain, Kerr, Russell, Detroit, MI, for plaintiff.

Karen B. Berkery, Kitch, Drutchas, John F. Brady, Brady, Hathaway, Detroit, MI, for defendant.

***ORDER ADOPTING RECOMMENDATION OF MAGISTRATE JUDGE IN PART, GRANTING DEFENDANTS' MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT ON FEDERAL CLAIMS, AND REMANDING STATE LAW CLAIMS TO STATE COURT***

LAWSON, District Judge.

This case arises from a dispute between the plaintiff, a physician, and the defendants, who participate in the operation of Hills & Dales Hospital, concerning the withdrawal of staff privileges from the plaintiff and the refusal by hospital representatives to honor certain agreements with the plaintiff. The case began in the Tuscola County, Michigan Circuit Court, from whence it was removed by the defendants on the basis of this Court's federal question jurisdiction. *See* 28 U.S.C. §§ 1331, 1441. The plaintiff has amended his complaint, which now includes claims based on 42 U.S.C. §§ 1981 and 1983. The parties have engaged in extensive, and sometimes contentious, discovery, and there are now several motions pending, including the defendants' motions for partial judgment on the pleadings and for summary judgment. Those motions were referred to the magistrate judge, who conducted a hearing and filed a Report and Recommendation recommending that the motions be granted. The parties have filed timely objections to the recommendation, and the Court has conducted a *de*

*novo* review of the motions and supporting papers. The Court concludes that to prevail on count I of the complaint, which states a claim under 42 U.S.C. § 1981, the plaintiff must prove, *inter alia,* that he was deprived of the rights and privileges enumerated in the statute by intentional discrimination on account of race, national origin, ancestry or ethnic characteristics. Although the magistrate judge applied the wrong test in analyzing the Section 1981 claim, the Court concludes nonetheless that the plaintiff has not come forward with sufficient evidence to defeat summary judgment, and the Court will therefore dismiss count I of the amended complaint. The Court also finds that none of the defendants are state actors within the meaning of 42 U.S.C. § 1983, and therefore count II of the amended complaint which is based on that statute must be dismissed. Further, the Court finds that the defendants are not entitled to immunity or attorney fees under the Healthcare Quality Improvement Act, 42 U.S.C. § 11111(a), *et seq.* Finally, the Court finds that the plaintiff's state law claims are not so devoid of merit as to warrant dismissal, but because some of them raise novel questions under state law, the Court will, in its discretion, decline to exercise supplemental jurisdiction and remand them to state court under 28 U.S.C. § 1367(c).

## I.

The magistrate judge has adequately summarized the facts in his report. The plaintiff objects to certain statements therein as irrelevant, incomplete or not construed in the light most favorable to the plaintiff, as the Court must do in adjudicating a defendant's motion for summary judgment. These criticisms are largely directed at observations which are not central to the dispute in counts I or II of the amended complaint. The claim that certain recitals are incomplete is also accompanied by the observation that there are witnesses yet to depose and that this Court ordered the depositions postponed until the summary judgment motions have been adjudicated. The discovery period established by the Case Management and Scheduling Order has elapsed, and the Court ordered that the plaintiff's request to take these depositions, which were identified as "trial depositions," should abide the decision on the dispositive motions, which may render that request moot. Nonetheless, with these objections in mind, the Court will summarize the facts which are stated in more detail in the first twenty-seven pages of the Report and Recommendation.

The plaintiff is a general surgeon who, between 1976 and 2001, exercised staff privileges at the Hills & Dales General Hospital located in Cass City, Michigan. During that time, the plaintiff was elected chief of the medical staff on three occasions; however, he often found himself embroiled in disputes with staff members and employees. Complaints to hospital administrators were lodged against the plaintiff, and the plaintiff likewise complained to hospital administrators regarding the conduct of staff members and employees. There are memoranda from this era to the plaintiff from then-hospital administrator Ken Jensen upbraiding the plaintiff for his abusive treatment of the nursing staff. The criticisms of the plaintiff's management and interpersonal relationship skills, however, did not prevent hospital officials from negotiating agreements with the plaintiff to purchase real estate, and the future arrangements to buy his medical practice at issue in this case. Nonetheless, the reports of conflicts between the plaintiff and other hospital personnel led the magistrate judge to conclude justifiably that Hills & Dales General was not a "happy hospital."

As noted above, in the 1980s, the plaintiff negotiated with hospital representatives to purchase land next to the hospital so he could construct a medical clinic. The plaintiff eventually purchased the land at a reduced price and constructed the clinic. The plaintiff alleges that the hospital verbally agreed to purchase the clinic and the plaintiff's surgical practice upon the plaintiff's death, disability or retirement. Ultimately, the hospital purchased the clinic, but not the plaintiff's practice.

In 1994, Ken Jensen was replaced by defendant Denise McKrow as the hospital administrator. The plaintiff, a member of the hospital board during this time, opposed the hiring of McKrow. The plaintiff and McKrow frequently clashed over a variety of staffing, personnel and administrative issues during McKrow's tenure as the hospital administrator. For example, the plaintiff complained that McKrow had hired a Dr. Jeffrey McErlean as an emergency room physician, despite the fact that this doctor had been relieved of surgical privileges at a hospital in Dearborn, Michigan because of patient safety concerns. The plaintiff also asserted that McKrow hired McErlean because McKrow wanted more Caucasian physicians. The majority of the 14 member medical staff were non-Caucasians. The plaintiff further complained about a Dr. Scott Placeway, an anesthesiologist whom McKrow had hired. The plaintiff asserted that Dr. Placeway was unacceptable and refused to use his services for the plaintiff's surgeries. The plaintiff also complained that Dr. Placeway committed medicare billing fraud.

In 1999, partly as a result of the plaintiff's complaints, defendant Roger Marshall, the president of the hospital board of trustees, hired Dr. Charles Carroll, a general surgeon from Wisconsin, to investigate the hospital. In his report to the hospital board, Dr. Carroll states that it

was his sense that the hospital "administration was out to get" the plaintiff and were using "potential quality issues ... to embarrass and undermine [the] credibility of Dr. Jeung." Pl.'s Ex. H at 4. At one point in the report, Dr. Carroll remarked about the "cultural differences" between Hills & Dales Hospital and the Pigeon Hospital he visited for comparison, and the plaintiff seized on this comment as evidence of a racial or ethnic rift. However, viewing Dr. Carroll's report in its entirety dispels that inference; earlier in the report he used the same term, noting that "[t]he culture of performance improvement must be institutionalized...." *Ibid.* He did not refer to "culture" as a means of describing a failure at Hills & Dales Hospital to accord non-Caucasian hospital staff and personnel "the same right ... to make and enforce contracts ... and to the full and equal benefit of all laws ... as is enjoyed by white citizens." *See* 42 U.S.C. § 1981. Dr. Carroll closed his report by stating his hope that his recommendations would "assist you in making some productive improvements in a hospital that certainly has many high quality attributes." *Id.* at 5. The plaintiff asserts that this report is the most important exhibit in this case.

After receipt of Dr. Carroll's report and after receiving a letter from the plaintiff's attorney regarding the plaintiff's concerns about how he was being treated, the hospital executive committee met with McKrow, Placeway and the plaintiff in an attempt to resolve the issues.

In December 1999, the hospital hired Dr. Garth Murray, a general surgeon, as a hospital employee, rather than as a private physician with staff privileges, like the plaintiff. The plaintiff alleges that the hospital thus realizes greater revenue from the surgeries performed by Dr. Murray than from the surgeries performed by the plaintiff.

In October 2000, a patient complained directly to McKrow concerning a potential unnecessary surgery performed by the plaintiff. Shortly thereafter, another physician wrote the hospital and expressed concern over unnecessary surgeries performed by the plaintiff. The complaints were forwarded to the hospital's medical executive committee and the matters were eventually closed without an investigation. However, in December of that same year, Dr. Murray complained to McKrow about the plaintiff pressuring a member of the medical staff to undergo surgery by the plaintiff instead of Dr. Murray, labeling this conduct as "unethical." McKrow received another complaint about the plaintiff from a Dr. Girgis, who also had complained earlier that year after the plaintiff had reprimanded him for violating the operating room gowning protocol, and the hospital also received notice that the Michigan Department of Consumer and Industry Services would be investigating the plaintiff's patient care.

After more complaints were received in 2001 concerning the plaintiff's medical practice and decisions, defendant Marshall, in a letter dated February 26, 2001, summarily suspended all of the plaintiff's surgical procedures. The plaintiff was the chief of the medical staff at the time. The plaintiff alleges that McKrow's secretary typed the letter and that McKrow was the "de facto perpetrator" of the summary suspension. The summary suspension letter advised the plaintiff that he had 45 days to request a hearing under the bylaws and in accordance with the Health Care Quality Improvement Act, 42 U.S.C. § 11111, *et seq.*

On March 5, 2001, the plaintiff requested a hearing. The plaintiff also wrote the acting chief of staff of the hospital stating that the hospital did not follow proper procedure in issuing his summary suspension. Subsequently, the hospital and the plaintiff agreed that the hospital would withdraw its summary suspension in exchange for the plaintiff's agreement to refrain from performing surgery at the hospital until the various investigations were completed. The hospital thereafter engaged the services of an entity called MetaStar to perform an independent review of procedures performed by the plaintiff from February 2000 to February 2001.

In April 2001, the plaintiff filed suit in the Tuscola County Circuit Court. The case was removed to this Court on May 13, 2001. The Court granted the plaintiff leave to file a first amended complaint on October 15, 2001. The plaintiff's amended complaint pleads federal civil rights claims of racial discrimination under 42 U.S.C. § 1981 and constitutional violations under 42 U.S.C. § 1983. The amended complaint also contains six pendent state claims alleging tortious interference with a business relationship, a violation of Michigan's Elliott–Larsen Civil Rights Act, promissory estoppel, defamation, a breach of the hospital's bylaws, and civil conspiracy.

Meanwhile, the MetaStar report was completed and forwarded to McKrow on July 16, 2001. The report concluded that the plaintiff engaged in "a significantly more aggressive practice pattern" compared to other surgical services in a three-county area, *see* Def.'s Ex. 34, but the plaintiff contends this conclusion was corrupted by McKrow's exertion of pressure to find fault with the plaintiff.

On September 25, 2001, the plaintiff notified the hospital that he would like to withdraw his medical and surgical privileges at the hospital effective October 1, 2001. *See* Pl.'s Ex. S. The hospital responded by telling the plaintiff that if it honored his request, the mandatory federal and state medical data base reporting requirements would be triggered, and loss

of the privileges also would constitute an adverse action under the Medical Staff Bylaws entitling the plaintiff to a hearing under Article VIII of the bylaws. *See* Pl.'s Ex. T at 2. The hospital asked the plaintiff to clarify his intentions.

The plaintiff apparently withdrew his request, and on December 14, 2001, McKrow wrote the plaintiff a letter informing him that the hospital had scheduled a hearing for January 21, 2002. *See* Def.s' Ex. 35 at 1. The hearing commenced on April 18, 2002 after the plaintiff requested an extension of time. However, the hospital refused to proceed beyond the initial procedural stage because two of the plaintiff's expert witnesses refused to leave the hearing room during the testimony. Despite the absence of any provision in the bylaws authorizing sequestration, the presiding officer of the hearing ordered the witnesses excused on the request of the hospital's attorney, who had failed to bring his own expert witnesses to the hearing room. Later that day, the hearing committee presented its report, which concluded that the plaintiff had failed to proceed with the hearing without showing good cause and therefore had waived his rights. The committee upheld the suspension of the plaintiff and the decision of the committee was ultimately upheld by the hospital board of directors. The plaintiff demanded appellate review of the adverse determination of the hospital board.

On February 15, 2002, the defendants filed a motion for partial judgment on the pleadings seeking dismissal of counts II, III, V, VII, and VIII of the plaintiff's first amended complaint under Federal Rule of Civil Procedure 12(c). The plaintiff filed a response and the defendants replied. On July 12, 2002, the defendants filed a motion for summary judgment on all claims in the plaintiff's complaint. The plaintiff also filed a response to this motion and the

defendants replied. Both parties filed voluminous sets of exhibits supporting their respective positions. Oral argument was held on the summary judgment motion on August 30, 2002 by the magistrate judge. His Report and Recommendation was filed on February 28, 2003. Both parties filed objections and responses to the respective objections.

## II.

■ A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on the ground that the complaint does not state a cognizable claim is reviewed under the standards that govern motions brought under Rule 12(b)(6). *See* Fed. R. Civ. P 12(h); *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511 (6th Cir. 2001); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir.1987). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993). When deciding a motion under that Rule, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir.1996). "A judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Ibid.* "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'" *In re DeLorean Motor Co.*, 991

F.2d 1236, 1240 (6th Cir.1993) (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). *See also Morgan*, 829 F.2d at 12 (liberal Rule 12(b)(6) review is not afforded legal conclusions and unwarranted factual inferences); *Ana Leon T. v. Federal Reserve Bank*, 823 F.2d 928, 930 (6th Cir.) (per curiam) (mere conclusions are not afforded liberal Rule 12(b)(6) review), *cert. denied*, 484 U.S. 945, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987).

Where materials beyond the pleadings are submitted in relation to the motion, the court will treat it as a motion for summary judgment under Rule 56. *See* Fed. R.Civ.P. 12(c). A motion for summary judgment under Rule 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir.2000). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary

judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

### A.

■ The magistrate judge concluded that count I of the complaint brought under 42 U.S.C. § 1981 must be dismissed because the plaintiff failed to make out a prima facie case establishing that the defendants' conduct toward the plaintiff was motivated by racial or ethnic animus. The test for a prima facie case used by the magistrate judge was that (1) the plaintiff belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendants intended to discriminate against him on the basis of race; and (3) the defendants' discriminatory conduct abridged a right enumerated in § 1981(a). R. & R. at 28. The magistrate judge stated further that once the plaintiff made this showing, the defendants must come forward with nondiscriminatory reasons for their actions, after which the plaintiff must then show that those reasons were mere pretext, although the analysis never proceeded that far because the plaintiff's demonstration of a prima facie case was found wanting. *Id.* at 28–29. The plaintiff objected to the report on the ground that the magistrate judge applied the wrong test to determine a prima facie case.

The Court agrees that magistrate judge misstated the components of a prima facie case under Section 1981; he confounded those components with the elements of the entire claim. *See Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 871–72 (6th Cir.2001) ("We believe that while the three-part test employed by the district court in the instant case adequately represents the plaintiff's *ultimate* burden of proof in a § 1981 action, it is inappropriate for use as a prima facie standard."). The well-known burden-shifting methodology generally referred to as the *McDonnell Douglas/Burdine* test, described in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), is employed when there is no direct evidence of discriminatory animus and the plaintiff must resort to circumstantial evidence to prove that element. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999).

"[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). It does not require the fact finder to draw any inferences to reach that conclusion. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). In this case, the magistrate judge correctly concluded, and the parties have not disputed, that there is no direct evidence of racial or ethnic animus. Therefore, with reference to the magistrate judge's formulation of the elements of the plaintiff's Section 1981 claim(erroneously identified in the report as the plaintiff's prima facie case), the Court should apply the *McDonnell Douglas/Burdine* test to determine if there is sufficient proof of the second element: intentional discrimination by the defendants.

The *McDonnell Douglas/Burdine* test originally was fashioned for employment

cases under Title VII, requiring proof of membership in a protected class, qualification for a position of employment, adverse job action (or failure to hire), and dissimilar treatment of a person outside the protected class. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089; *Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir.2003). Although its framework is useful, it requires some modification in the context of Section 1981, especially in the commercial context. *See Christian*, 252 F.3d at 868. The Court must therefore examine the evidence to determine whether the plaintiff has established a prima facie case; if so, the defendant must come forward with a legitimate, nondiscriminatory reason for its actions. If the defendant makes such a showing, then the plaintiff must prove that the defendant's proffered reasons were in fact a pretext for the discrimination. *Ibid.* Under this methodology, the plaintiff must first come forward with evidence that he was denied a right, privilege or opportunity that was available to others who were not members of the plaintiff's protected class. Such proof "raises an inference of discrimination only because we presume [the defendant's] acts, if not otherwise explained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. As noted above, the defendant is then given the opportunity to dispel this inference by offering legitimate, nondiscriminatory reasons for the action. The legitimacy of these reasons is then tested in the third phase of the analysis.

Dr. Jeung alleges in his amended complaint that the hospital and its administrators refused to honor the contract to purchase the plaintiff's medical practice, and forced him off of the medical staff, because of his race and ethnic background. These claims do not arise in the employment context, strictly speaking, and the definition of a prima facie case for employment cases may not suffice in a non-employment, commercial setting. However, in *Christian*, the court observed that the burden-shifting framework is a flexible test that is amenable to "distinct formulation[s] ... in differing factual circumstances." *Christian*, 252 F.3d at 869. There, the court fashioned a version for use in commercial retail cases which required the plaintiff to prove a prima facie case by showing (1) membership in a protected class, (2) an effort to make or enforce a contract for products or services which the defendant provides, and (3) denial of the benefits of the contractual relationship allowed to others outside the class, or that the services were furnished in a hostile manner demonstrated to be objectively discriminatory. *Id.* at 872.

That formulation may require additional modification in the present setting, since certain features of commercial, retail dealings are absent in professional, medical contractual relationships. Nonetheless, the nature of the professional relationship between a doctor and a hospital where he or she seeks to ply surgical skills for profit does not diminish the "promise of § 1981(b), which guarantees all persons equal rights in 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Id.* at 873. *See also Patel v. Midland Memorial Hosp. and Medical Center*, 298 F.3d 333, 342 (5th Cir.2002) (applying burden-shifting methodology in an action by a cardiologist against hospital and its doctors for wrongful suspension of clinical privileges on the basis of race under Section 1981, concluding that defendants' concern for patient safety was legitimate, nondiscriminatory,

and non-pretextual reason for suspension); *Sanghvi v. St. Catherine's Hosp., Inc.,* 258 F.3d 570, 577 (7th Cir.2001) (granting summary judgment for defendants after employing burden-shifting template in action by a physician of Asian Indian ethnicity against hospital alleging racial discrimination under Section 1981 in connection with the hospital's refusal to sell another physician's practice to him, despite presentation of direct evidence of discrimination).

■ To present a prima facie case which generates an inference of unlawful discrimination in violation of Section 1981 in this context, therefore, there must be evidence that: (1) the plaintiff is a member of a protected class; (2) the plaintiff sought to make or enforce a professional services contract in a manner generally engaged in by the medical institution; (3) the institution refused to engage or continue to deal with the plaintiff while it continued similar professional ties with others outside the class, or treated the plaintiff with a degree of hostility that a reasonable person would find discriminatory. *See Callwood v. Dave & Buster's, Inc.,* 98 F.Supp.2d 694, 707 (D.Md.2000), *cited in Christian,* 252 F.3d at 871. In evaluating the nature of the "hostility" in the third prong of the test, the *Callwood* court focused on whether the defendant's conduct was (a) "profoundly contrary" to the defendant's financial or professional interests, (b) markedly "outside of widely-accepted business norms," and (c) "so arbitrary on its face, that the conduct supports a rational inference of discrimination." *Callwood,* 98 F.Supp.2d at 707. Those factors are useful in the present context as well.

■ Applying that test to the present facts, the Court concludes that the plaintiff has established a prima facie case of discrimination. By virtue of his Korean ancestry, the plaintiff is a member of a protected class within the meaning of Section 1981, which prohibits discrimination on the basis of race and national origin. *See St. Francis College v. Al Khazraji,* 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). He attempted to engage in a professional contractual relationship with Hills & Dales Hospital in order to perform surgery on his patients at that facility, but he was ousted from the medical staff. In addition, he attempted to enforce a contract he claims he made with hospital representatives for the purchase of his medical practice. Finally, the hospital continued to permit another general surgeon, a Caucasian male, to perform surgeries using its facilities. These facts taken in the light most favorable to the plaintiff may raise an inference of unlawful discrimination requiring the defendants to come forward with an alternate explanation.

■ The defendants have done so here. They contend that the summary suspension had nothing to do with the fact that the plaintiff was of Korean lineage, but rather it resulted from receipt of two requests for investigation of the plaintiff from other physicians, two patient complaints against Dr. Jeung for unnecessary or improper care, the pendency of two medical malpractice lawsuits against him, receipt of three additional notices of intent to sue arising from Dr. Jeung's medical conduct, and an impending investigation by the Michigan Department of Consumer and Industry Affairs. They declined to purchase the plaintiff's medical practice because they deny that any such contractual obligation exists, and that it is not in the economic interest of the hospital to do so. Finally, they explain that the hostility and acrimony that characterized the relationship between the hospital administration and the plaintiff over the years grew from the plaintiff's vituperative and dicta-

torial personality directed toward the medical and nursing staffs.

These nondiscriminatory reasons are sufficient to shift the burden back to the plaintiff to show pretext. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A claimant can demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001) (alteration in original)). *See also Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir.1990) (holding that statistical evidence presented by the plaintiff showing an employer's pattern of conduct toward a protected class is relevant to a showing of pretext and can create an inference of discrimination); *Johnson v. U.S. Dept. of Health and Human Services*, 30 F.3d 45, 47–48 (6th Cir.1994) (holding that the plaintiff had failed to prove the defendant's reasons for not hiring the plaintiff were pretext because the plaintiff failed to submit any evidence other than her own subjective testimony that she was more qualified for the job than the selectee).

It must be recognized, however, that it is not merely the falsity or incorrectness of the articulated reason that gives rise to the conclusion of pretext. Rather, it is the resulting absence of legitimate explanation for the suspect employment decision that warrants the finding of discrimination. Where two or more alternative and independent legitimate, nondiscriminatory reasons are articulated by the defendant employer, the falsity or incorrectness of one may not impeach the credibility of the remaining articulated reason(s).

*Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir.1987).

■ Under the prevailing summary judgment standard, the plaintiff must come forward with evidence sufficient to create a question of fact upon which reasonable minds might differ on the issue of pretext. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. He has not done so here. Although he states that the summary suspension has administrator McKrow's fingerprints all over it, the plaintiff offers no evidence that the physician or patient complaints were fabricated or prompted by hospital administrators, or that the malpractice filings or State investigation were contrived. Nor does he contend that the medical staff bylaws did not confer the authority to impose the summary suspension. *See* Def.s' Ex 27 at 22–23. The plaintiff vigorously contests the merits of the suspension, but there is no evidence in the record from which one might infer that race animated this professional dispute. Dr. Carroll's report contains statements that the administration was seeking a basis to undermine Dr. Jeung's credibility and embarrass him, but he attributes this conduct to the hospital's economic interests and the fallout from the "poorly planned and executed process" to bring a new anesthesiologist onto the staff. Pl.'s Ex. H. Dr. Carroll provides no evidence from which discrimination or pretext can be inferred.

Likewise, there is no evidence that the hospital's refusal to purchase the plaintiff's medical practice and office building is

based on anything other than economics, or that this reason is a pretext for discrimination. This conclusion is inescapable when the transactions between the hospital and Dr. Jeung are viewed in their entirety. There is no written record of an obligation to repurchase the land and building sold to Dr. Jeung in the 1980s, and the plaintiff does not dispute the hospital's lack of any need for additional office space thirty years later. Moreover, the hospital offered to assist Dr. Jeung in exploring recruitment for other physicians if he could locate a buyer, and the plaintiff eventually did sell the real estate for more than its appraised value. The plaintiff has not offered any rationale explaining how considerations of race interfered with the sale of his medical practice to the same entity that engaged in efforts to assist in the sale of his commercial real estate.

The Court agrees with the magistrate judge that there is no genuine issue of material fact with respect to the allegations in count I of the amended complaint, although for different reasons. The Court, therefore, will adopt the recommendation, although not the report, and dismiss that count.

### B.

The second count of the amended complaint alleges a violation of 42 U.S.C. § 1983, based on an abridgment of the plaintiff's rights under the First Amendment. The magistrate judge found that none of the defendants were state actors, and that there was an absence of evidence on an essential element of this claim. The plaintiff offers no serious objection to this conclusion, and the Court agrees that it is correct.

To establish a *prima facie* case under Section 1983, a civil rights plaintiff must establish that (1) the defendant acted under color of state law; and (2) the offend-

ing conduct deprived the plaintiff of rights secured by federal law. *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). "If a plaintiff fails to make a showing on any essential element of a § 1983 claim, it must fail." *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir.2001).

■ The pending complaint lacks an arguable basis in law because plaintiff has not established that defendants acted under color of state law. The defendants are to be private citizens and a privately-owned corporation. The Court recognizes that private citizens engaged in joint activity with state officials act under color of state law for purposes of Section 1983. *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Redding,* 241 F.3d at 533. The Supreme Court has explained:

> If the Fourteenth Amendment is not to be displaced ... its ambit cannot be a simple line between States and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, we say that state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself." *Jackson [v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)].

What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary

condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government. *See [National Collegiate Athletic Assn. v. Tarkanian,* 488 U.S. 179, 193, 196, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)]; *Polk County v. Dodson,* 454 U.S. 312[, 102 S.Ct. 445, 70 L.Ed.2d 509] (1981).

Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," *Blum [v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)], when the State provides "significant encouragement, either overt or covert," *ibid.,* or when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar [v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)] (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," *Pennsylvania v. Board of Directors of City Trusts of Philadelphia,* 353 U.S. 230, 231[, 77 S.Ct. 806, 1 L.Ed.2d 792] (1957) (per curiam), when it has been delegated a public function by the State, *cf., e.g., West v. Atkins,* [487 U.S. 42, 56, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)]; *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 627–628[, 111 S.Ct. 2077, 114 L.Ed.2d 660] (1991), when it is "entwined with governmental policies" or when government is "entwined in [its] management or control," *Evans v. Newton,* 382 U.S. 296, 299[, 86 S.Ct. 486, 15 L.Ed.2d 373] (1966).

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295–96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (footnote omitted).

Here, none of the characteristics of state action can be found in the operation of this private hospital. The magistrate judge has cited abundant authority, including cases from this Circuit, concluding as a matter of law that private hospitals operating as not-for-profit entities under the Internal Revenue Code and receiving public funds through federal welfare programs are not thereby converted into state actors within the meaning of Section 1983. *See, e.g., Crowder v. Conlan,* 740 F.2d 447, 449–53 (6th Cir.1984); *Jackson v. Norton–Children's Hosps., Inc.,* 487 F.2d 502 (6th Cir. 1973). The same conclusion is compelled in this case. Count II of the amended complaint will likewise be dismissed.

### C.

The plaintiff has also advanced claims arising under Michigan law pursuant to this Court's supplemental jurisdiction, since they form part of the same controversy as the Section 1981 claim. *See* 28 U.S.C. § 1367(a). Those claims include theories based on tortious interference with a contract and business relationship (count III), a violation of Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws § 37.2301, *et seq.* (count IV), promissory estoppel (count V), defamation (count VI), breach of medical staff bylaws (count VII), and civil conspiracy (count VIII). The magistrate judge has commented on the lack of merit of each of these claims, but the Court rejects this portion of the report. These claims all arise out of the relationship between a staff physician and a hospital, and the rights and obligations which may arise with respect to the patients of each. The issues are not settled by clear pronouncements of state law. For example, for the proposition that medical staff bylaws do

not create contract rights, the magistrate judge cites an unpublished Michigan Court of Appeals opinion. *See* R & R at 30. The state courts are likely better situated to determine these claims.

 Title 28, Section 1367 provides:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In deciding substantive state law claims, it is the obligation of the federal district courts to apply the law of the state's highest court, or to ascertain the state law from all relevant data. *See Central Mich. Bd. of Trs. v. Employers Reinsurance Corp.*, 117 F.Supp.2d 627, 632 (E.D.Mich.2000). There is especially no good reason for this Court to retain jurisdiction in this case and to engage in the endeavor of determining and applying state law when there are no federal claims remaining in this Court; the discovery is complete, and the state court need only determine any further dispositive motions and, if appropriate, try the case, applying the appropriate state evidentiary laws.

 Where a case containing both federal and state law claims has been removed to this Court pursuant to the court's federal question jurisdiction under 28 U.S.C. §§ 1331 and 1441, and the federal claims have been dismissed, this Court has discretion to either dismiss the remaining state law claims or to remand

them. *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir.2000). In exercising that discretion, the Court may consider the convenience of the parties and expeditiousness in resolving the case. *Ibid.* The plaintiff in this case originally filed the action in the Tuscola County Circuit Court, his forum of choice.

The Court believes that it is more appropriate to remand the state law claim to the plaintiff's original forum of choice rather than dismiss it.

### D.

Finally, the defendants object to the Report and Recommendation because the magistrate judge failed to address their claim of immunity and request for attorney fees under the Healthcare Quality Improvement Act, 42 U.S.C. § 11111(a), *et seq.* The immunity provisions of the Act state:

If a professional review action (as defined in section 11151(9) of this title) of a professional review body meets all the standards specified in section 11112(a) of this title, except as provided in subsection (b) of this section, [the professional review body and those participating with and assisting it] shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action. The preceding sentence shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C.2000e, et seq. and the Civil Rights Acts, 42 U.S.C.1981, et seq.

42 U.S.C. § 11111(a)(1).

 By its terms, the statute does not apply to federal and state civil rights actions. The defendants therefore are not entitled to immunity from counts I, II or

IV of the amended complaint according to the plain meaning of the statute.

In addition, immunity is afforded only if the body conducting the review conforms to the requirements "specified in section 11112(a)" of Title 42. That section requires, among other things, "adequate notice and hearing procedures ... afforded to the physician involved or ... such other procedures as are fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). The hearing is "adequate," if, when requested on a timely basis, it includes the following:

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician involved has the right—

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

42 U.S.C. § 11112(b)(3).

In this case, the hearing to review the plaintiff's summary suspension, which the plaintiff demanded, never got underway because of a procedural dispute over sequestration of the plaintiff's expert witnesses. The defendants do not contend here that there was any rule or bylaw provision that permitted them to exclude expert witnesses, or that any judicial or administrative rule of evidence applied to the review hearing. In fact, it is common in adversary proceedings for expert witnesses to be present during the presentation of factual testimony so that they have a foundation on which to base their opinions. *See, e.g.,* Federal Rule of Evidence 615. Although that Rule authorizes a district court to sequester witnesses to prevent them from hearing the testimony of other witnesses, it also provides several exceptions, including an exception for "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Fed.R.Evid. 615(3). The Advisory Committee notes specify that this exception contemplates "an expert needed to advise counsel in the management of the litigation." Fed.R.Evid. 615(3) Advisory Committee notes. *See United States v. Mohney,* 949 F.2d 1397, 1404–05 (6th Cir. 1991) (holding that "the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves before the jury"); *Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 630 (6th Cir.)

("where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel"), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). *See also Trans World Metals, Inc. v. Southwire Co.,* 769 F.2d 902, 911 (2d Cir.1985) (expert allowed to remain in the courtroom for the testimony of the adversary's expert); *United States v. Conners,* 894 F.2d 987, 991–92 (8th Cir.1990) (in trial of bank owner for embezzlement and related offenses, FDIC examiner fit exemption 3 where he testified as expert and government argued that his presence was essential to his ability to give effective testimony on exhibits).

■ The rationale on which the review body chose to exclude the plaintiff's expert witnesses in this case is not clear from the record made, except to accommodate the hospital's attorney who did not bring his expert witnesses to the hearing; when asked for an explanation for the ruling the presiding officer declined to provide one. The hospital's refusal to proceed with the hearing violated the plaintiff's right "to call, examine, and cross-examine witnesses [and] to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law." 42 U.S.C. § 11112(b)(3)(C)(iii) & (iv). Instead of presenting evidence to justify the summary suspension, the hospital found that is was Dr. Jeung who failed to proceed with the hearing and therefore forfeited his rights. However, the statute allows a forfeiture only when "the physician fails, without good cause, to appear." 42 U.S.C. § 11112(b)(3)(B). Dr. Jeung in fact appeared with his attorney and witnesses, ready to proceed. The defendants have not established, therefore, that they have "met all the standards specified in section 11112(a)," which is a prerequisite for immunity.

■ Furthermore, the statute does not purport to confer immunity for actions unrelated to the review process. It cannot afford the defendants relief from the plaintiff's claims relating to the breach of an agreement to purchase his property or medical practice, or the claims of false statements made outside the review process.

The defendants rely on Section 11113 in support of their request for attorney fees. That statute states:

> In any suit brought against a defendant, to the extent that a defendant has met the standards set forth under section 11112(a) of this title and the defendant substantially prevails, the court shall, at the conclusion of the action, award to a substantially prevailing party defending against any such claim the cost of the suit attributable to such claim, including a reasonable attorney's fee, if the claim, or the claimant's conduct during the litigation of the claim, was frivolous, unreasonable, without foundation, or in bad faith.

42 U.S.C. § 11113. A request for attorney fees under this statute invokes the Court's discretion. *Muzquiz v. W.A. Foote Memorial Hosp., Inc.,* 70 F.3d 422, 432 (6th Cir.1995).

■ As noted above, the Court does not find that the defendants complied with the standards in Section 11112(a), and therefore have not satisfied a necessary prerequisite for attorney's fees under the statute. Moreover, although the Court will dismiss the plaintiff's federal claims because there is no material fact issue presented on the element of racial or ethnic animus, the Court does not find that the plaintiff's claims are frivolous. An ac-

tion is frivolous "if it lacks an arguable basis either in law or fact." *Dellis v. Corrections Corporation of America,* 257 F.3d 508, 511 (6th Cir.2001) (citing *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989)). There is evidence in the record of intense personal animosity between the plaintiff and administrator McKrow. Dr. Charles Carroll's report concludes that administrators were "out to get" the plaintiff by personally embarrassing him and undermining his credibility. The plaintiff insists that the MetaStar report was initially favorable to him, but was changed after pressure was exerted by McKrow to find fault with Dr. Jeung. Finally, the hospital refused to proceed with the review hearing to which Dr. Jeung was entitled by statute based on a questionable procedural ruling. The plaintiff's claims for violation of his rights under federal and state law were not "frivolous, unreasonable, without foundation, or in bad faith." The defendants are not entitled to attorney's fees under 42 U.S.C. § 11113.

### III.

The Court agrees with the recommendation of the magistrate judge that the plaintiff's federal claims should be dismissed as a matter of law, but does not accept the rationale stated in the report with respect to the claim based on 42 U.S.C. § 1981. The Court will decline to exercise supplemental jurisdiction over the remaining claims based on state law. Finally, the defendants are not entitled to attorney's fees under the Healthcare Quality Improvement Act.

Accordingly, it is **ORDERED** that the Report and Recommendation [dkt. # 115] is **ADOPTED IN PART AND REJECTED IN PART.**

It is further **ORDERED** that the defendants' motions for partial judgment on the pleadings and for summary judgment (dkt. #s 43, 76, 88) are **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that counts I and II of the amended complaint are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the matter, consisting of the plaintiff's remaining claims, is **REMANDED** to the Tuscola County, Michigan Circuit Court for further proceedings.

It is further **ORDERED** that the defendants' motion for attorney fees, as contained in their summary judgment motion, under the Healthcare Quality Improvement Act [dkt. # 76] is **DENIED.**

It is further **ORDERED** that the following motions are **DISMISSED AS MOOT:** plaintiff's motion for leave to file Second Amended Complaint (dkt. # 68), plaintiff's motion to compel production of documents regarding the creden.tialing file of Jeffrey McErlean, M.D. (dkt. # 74), defendants' motion to preclude the testimony of plaintiff's expert witnesses (dkt. # 75), plaintiff's motion challenging defendants' expert witness Scott Reich, M.D. (dkt. # 77), plaintiff's motion challenging defendants' expert witness Mark Gottlieb, Ph.D. (dkt. # 78), defendants' motion in limine to exclude evidence and testimony regarding sexual harassment/employment allegations against Thomas Oesch (dkt. # 90), defendants' motion in limine to exclude evidence and testimony regarding the alleged misconduct or substandard care of other physicians (dkt. # 91), defendants' motion in limine to preclude evidence of trial outcome in plaintiff's medical malpractice case (dkt. # 92), defendants' motion in limine to exclude evidence and testimony regarding Dr. Jeffrey McErlean (dkt. # 93), defendants' motion in limine to preclude evidence and testimony regarding plaintiff's malpractice suit against

Mike and the Currie, Kendall Law Firm (dkt. # 94), defendants' motion in limine to preclude plaintiff's valuation report (dkt. # 95), defendants' motion in limine to preclude testimony from plaintiff that he previously refused to disclose in discovery and allow an adverse inference (dkt. # 96), defendants' motion in limine to preclude admission of Dr. Carroll's Report (dkt. # 97), defendants' motion in limine to exclude the unsigned memorandum regarding billing practices (dkt. # 98), plaintiff's motion in limine concerning the content of complaints made by patients not asserting malpractice claims (dkt. # 99), plaintiff's motion in limine concerning the testimony of William Corsini, M.D. (dkt. # 100), plaintiff's motion in limine to preclude testimony of David French (dkt. # 101), plaintiff's motion in limine to preclude the testimony of Bonnie Johnson (dkt. # 102), and plaintiff's motion in limine to exclude reference to earlier malpractice suits against Dr. Jeung (dkt. # 103).